UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| GRACIE ALVARADO,<br><br>    Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of the Social<br>Security Administration,<br><br>    Defendant. | Case No. CV 16-7207 AJW<br><br>MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The procedural facts are summarized in the joint stipulation. [See JS 1-2]. In a written hearing decision that constitutes the Commissioner's final decision in this matter, an administrative law judge (the "ALJ") found that plaintiff had severe impairments consisting of anxiety, depression, and obsessive compulsive disorder ("OCD"), but that she retained the residual functional capacity ("RFC") to perform work at all exertional levels requiring no more than simple, routine tasks and occasional contact with public and co-workers. [AR 23]. The ALJ concluded that the plaintiff was unable to perform her past relevant

work but could perform alternate jobs that exist in significant numbers in the national economy. [AR 25-26]. Therefore, the ALJ concluded that plaintiff had not been disabled since October 1, 2012, the date her application was filed. [AR 26].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

**Discussion**

**Lay witness testimony**

Plaintiff contends that the ALJ erred in rejecting without comment the hearing testimony given by plaintiff's sister, Stephanie Alvarado ("Ms. Alvarado").

During the hearing, Ms. Alvarado testified that she had heard plaintiff's answers to questions asked by her counsel and that her answers to those questions about her sister would be "[a]bout the same." Ms. Alvarado said that she lives in plaintiff's neighborhood and goes to plaintiff's house multiple times every day "to help her take care of her kids and to make sure she's okay." [AR 57-58]. Ms. Alvarado said that she helped plaintiff by doing things such as cleaning, giving her niece a bath, making sure plaintiff got out of bed to help her son and to pick the children up from school, making sure plaintiff's son did his homework, and cooking. [AR 57-58, 60]. Asked what concerns she had about her sister's ability to sustain a regular work schedule, Ms. Alvarado testified that plaintiff was forgetful and had crying spells about four times a day on a "the bad days," which occurred three or four days a week. [AR 58-59]. Ms. Alvarado also

said that plaintiff would not get out of bed three or four days a week. [AR 59-60]. Asked whether she had observed plaintiff engage in "bizarre behaviors," Ms. Alvarado said that plaintiff sometimes "panicked" and would just start cleaning and washing her hands. [AR 60]. Ms. Alvarado testified that plaintiff sometimes got confused about what day of the week it was. She added that she always had to take plaintiff to her doctor's appointments or to do her shopping, and that she did most of plaintiff's shopping for her. [AR 61]. Ms. Alvarado also said that plaintiff had difficulty following conversations and sometimes needed help remembering to take her medications as prescribed. [AR 62].

The ALJ did not comment on Ms. Alvarado's testimony. That omission was legal error because the ALJ

> must consider lay witness testimony concerning a claimant's ability to work. Such testimony is competent evidence and *cannot* be disregarded without comment. If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons that are germane to each witness. Further, the reasons germane to each witness must be specific.

Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (internal quotation marks and citations omitted); see Molina v. Astrue, 674 F.3d 1104, 1114–1115 (9th Cir. 2012) (stating that "if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness," but holding that since "lay witness testimony *cannot* be disregarded without comment," the ALJ committed legal error where she failed to point to individualized or reasons for disregarding lay witness testimony).

Defendant contends that since the ALJ properly rejected plaintiff's testimony and her mother's written third-party function report, the ALJ was entitled to reject Ms. Alvarado's "duplicative testimony for the same reason he rejected Plaintiff's mother's statement," making any error harmless. [JS 5-6].

The Ninth Circuit "adhere[s] to the general principle that an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." Molina, 674 F.3d at 1115 (internal quotation marks omitted). In Molina, the Ninth Circuit rejected the argument that "an ALJ's failure to give individualized reasons for rejecting a lay witness's testimony that would be material standing alone is per se prejudicial, even if the ALJ gave well-supported reasons for rejecting similar testimony." Molina, 674 F.3d at 1117. Instead, the Ninth Circuit joined the Eighth Circuit in holding "that an ALJ's failure to

comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims.'" Molina, 674 F.3d at 1121–1122 (brackets omitted) (quoting Buckner v. Astrue, 646 F.3d 549, 560 (8th Cir. 2011)). In order for the ALJ's error to be harmless, Ms. Alvarado's testimony must not "describe any limitations beyond those [plaintiff] herself described," *and* the ALJ must have rejected plaintiff's testimony "based on well-supported, clear and convincing reasons." Molina, 674 F.3d at 1122.

Plaintiff contends that the ALJ's error is not harmless because Ms. Alvarado's testimony was not duplicative of plaintiff's testimony. Specifically, plaintiff contends that Ms. Alvarado testified that plaintiff's crying spells and episodes of remaining in bed during the day happened three or four times a week; that plaintiff was forgetful and had difficulty concentrating; and that Ms. Alvarado did most of plaintiff's shopping. [JS 7].

Plaintiff's contention is unpersuasive because Ms. Alvarado described no significant limitations beyond those described by plaintiff herself. Plaintiff testified that she had migraines three or four days a week, and that she took medication with partial relief. She did not drive. She only left her home for doctor's appointments and if she had to go to the store, which she preferred to do at midnight, when fewer people were around. [AR 37-38]. She had not left her house alone in about four years. [AR 41, 50]. She did not like to be alone in the house and was afraid to be by herself, but the only people she wanted around her were her mother, her sister, and her boyfriend. Otherwise, she did not socialize. She had depression and crying spells. Sometimes things got so bad that she wished she "weren't here," but she had not attempted suicide. [AR 37-38]. Plaintiff saw a psychiatrist once a month for medication. [AR 38-39]. She tried to take care of her children, ages 4 and 11, but it was hard with her depression and headaches; there were days when she just stayed in her room, and her boyfriend took care of her kids. [AR 40]. She did not watch television or use a computer, but she tried to do a little house cleaning. [AR 40]. She slept, or at least stayed in bed, off and on throughout the day and night because of her headaches, but she only got about six hours of sleep, which is why she took a sleeping pill. [AR 41-42]. She had visual hallucinations of a shadow on a daily basis. [AR 45]. Plaintiff washed her hands six or eight times a day. She could not tolerate having her kitchen dirty and cleaned it around six times a day, but there were times when she could not clean it. [AR 46-47]. About two days a week she felt less depressed than the remaining five days. Sometimes she stayed

in bed so long that she needed help feeding and showering her children. [AR 48-49]. She did not attend any of her children's school events because being around a lot of people made her nervous. [AR 50]. Plaintiff said that she forgot information quickly and needed help taking her medications; her sister, mother, or boyfriend reminded her when to take them, but she still sometimes forgot. [AR 50]. She also had trouble concentrating, such as forgetting something she just read. [AR 51]. Plaintiff's severe migraines lasted up to four hours, and the pain reached an eight on a ten-point scale, sometimes forcing her to lie down. She headache. Her medications helped relieve the pain of a mild headache but did not alleviate it completely. [AR 51-52]. She also suffered from "very bad shoulder pain" that "comes down [her] whole arm" and "bothers [her] all day long." [AR 53]. She could not lift her daughter or even hold a bowl of cereal due to pain. [AR 54]. The shoulder and arm pain made her hands feel weak; she could not unscrew a bottle, chop food, or raise her hands above her head to put dishes away without pain. She could dress herself, but washing her hair hurt. [AR 54-56]. She attended physical therapy. [AR 56].

Since Ms. Alvarado's testimony is cumulative of plaintiff's, the remaining question is whether the ALJ articulated legally sufficient reasons for rejecting plaintiff's subjective testimony. Plaintiff contends that the ALJ did not do so. For the reasons described below, the Court agrees. Therefore, the ALJ's legal error in disregarding Ms. Alvarado's testimony cannot be considered harmless.

**Plaintiff's subjective testimony**

Plaintiff contends that the ALJ improperly discredited plaintiff's subjective symptom testimony.

If the record contains objective evidence of an underlying physical or mental impairment that is reasonably likely to be the source of a claimant's subjective symptoms, the ALJ is required to consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). Absent affirmative evidence of malingering, the ALJ must then provide specific, clear, and convincing reasons for rejecting a claimant's subjective complaints. Vasquez v. Astrue, 547 F.3d 1101, 1105 (9th Cir. 2008); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160-1161 (9th Cir. 2008); Moisa, 367 F.3d at 885. The ALJ "may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." Bray v. Comm'r of Social Sec. Admin., 554 F.3d 1219, 1221, 1227 (9th Cir. 2009);

Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir.1997). The ALJ's reasons for rejecting subjective testimony "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885. If the ALJ's interpretation of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Since there was no affirmative evidence of malingering, the ALJ was required to articulate specific, clear, and convincing reasons for rejecting the alleged severity of plaintiff's subjective symptoms. The ALJ's reasons do not meet this standard.

To begin with, the ALJ said that plaintiff's treating physicians prescribed "limited and conservative treatment," and that while plaintiff "initially complained of anxiety and depression to her treatment providers, she showed a good response to medications." [AR 24 (citing 224-245, 370)]. Plaintiff received mental health treatment at Clinicas del Camino Real ("Clinicas") from August 2012 at least through February 2015. [See AR 224-247, 280-286, 368-387, 407-408]. As the ALJ noted, when plaintiff initially presented to Clinicas in August 2012, she complained of anxiety and depression and was diagnosed with anxiety disorder not otherwise specified ("NOS"), depression, and agoraphobia with panic attacks. [AR 224-225]. During her followup visit the next month, however, her treating clinician was already considering whether "patient meets criteria for obsessive-compulsive disorder," and plaintiff eventually was diagnosed with OCD, one of the impairments that the ALJ found severe. [See AR 231-238, 370-373]. Therefore, plaintiff's subjective complaints of OCD-type symptoms were documented in her treatment reports along with her subjective symptoms of anxiety and depression.

Plaintiff was prescribed a regimen of antidepressant, anti-anxiety, and anti-psychotic medications along with some counseling. [See AR 224-247, 280-286, 288, 368-387, 407-408]. Plaintiff's prescribed psychiatric medications consisted of some combination of the antipsychotic drug Abilify (aripiprazole),[1]

---

[1] Aripiprazole is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used alone or with other medications to treat episodes of mania or mixed episodes (symptoms of mania and

6

the antidepressant medications fluoxetine[2] and sertraline[3], the anti-anxiety medications lorazepam[4] and hydroxyzine[5], and trazodone for sleep.[6] [See AR 219, 240, 249, 267, 371-372]. The ALJ did not point to any that such a course of treatment could reasonably be considered "limited and conservative" relative to the severity of plaintiff's conditions.

Furthermore, the only evidence cited by the ALJ as evidence of plaintiff's "good response to medications" is a Clinicas medication management note dated February 4, 2015. [AR 370]. Plaintiff presented to her treating nurse practitioner ("NP") Kristin Wilkerson in September 2014 reporting a

---

> depression that happen together) in adults, teenagers, and children 10 years of age and older with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Aripiprazole is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone.

See U.S. Nat'l Library of Med. & Nat'l Inst. of Health, MedlinePlus website, Aripiprazole, *available at* https://medlineplus.gov/druginfo/meds/a603012.html (last visited Aug. 21, 2017).

[2] Fluoxetine (Prozac) is used to treat a variety of mental disorders, including depression, obsessive-compulsive disorder, some eating disorders, and also panic attacks. See U.S. Nat'l Library of Med. & Nat'l Inst. of Health, MedlinePlus website, Fluoxetine, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html (last visited Aug. 21, 2017).

[3] Sertraline HCI (Zoloft) is used to treat depression, OCD, panic attacks, post-traumatic stress disorder, and social anxiety disorder. U.S. Nat'l Library of Med. & Nat'l Inst. of Health, MedlinePlus website, Sertraline, *available at* https://medlineplus.gov/druginfo/meds/a697048.html (last visited Aug. 23, 2017).

[4] Lorazepam is in a class of medications called benzodiazepines and is used to relieve anxiety. See U.S. Nat'l Library of Med. & Nat'l Inst. of Health, MedlinePlus website, Lorazepam, *available at* https://medlineplus.gov/druginfo/meds/a682053.html#why (last visited Aug. 22, 2017).

[5] Hydroxyzine, an antihistamine, is used in adults and children to relieve itching caused by allergic skin reactions. It is also used alone or with other medications in adults and children to relieve anxiety and tension U.S. Nat'l Library of Med. & Nat'l Inst. of Health, MedlinePlus website, Hydroxyzine, *available at* https://medlineplus.gov/druginfo/meds/a682866.html#why (last visited Aug. 22, 2017).

[6] Trazodone is used to treat depression, and is also sometimes used to treat insomnia and schizophrenia. U.S. Nat'l Library of Med. and Nat'l Inst. of Health, MedlinePlus website, Trazodone, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html#why (last visited Aug. 21, 2017).

worsening of her symptoms of depression and anxiety and "extremely difficult" functioning. [AR 378]. Her medications were adjusted and counseling was recommended. [AR 381]. During a follow up visit in October 2014, she was tearful and reported continuing problems with "decreased energy, fatigue, seeing shadows." [AR 374]. NP Wilkerson noted that plaintiff "continues to wait to get counseling," which was "imperative," and again adjusted plaintiff's medications. [AR 374, 376].

When plaintiff returned for follow-up in February 2015, she reported that she had stopped taking sertraline because she "didn't find it helpful." [AR 370]. Plaintiff continued to clean her kitchen up to five times a day and to wash her hands up to ten times a day. She avoided public places due to germs and did not like to take her children out in public. [AR 370]. Her mental status examination revealed a depressed, anxious mood and congruent affect, but was otherwise within normal limits. [AR 371]. The note states that plaintiff had "chronic problems" consisting of anxiety disorder, not otherwise specified, and depression. [AR 370]. Plaintiff's current diagnoses were obsessive-compulsive disorders; post-traumatic stress syndrome ("PTSD"); and depression, major, recurrent, severe with psychosis. [AR 371]. Her current Global Assessment Score ("GAF") score was 55, denoting moderate symptoms or moderate difficulty in social, occupational, or school functioning.[7] NP Wilkerson continued plaintiff on the antipsychotic drug Abilify, which, she noted, had helped plaintiff's hallucinations. She also started plaintiff on fluoxetine for depression, and continued her on trazodone for sleep and hydroxyzine for anxiety. [AR 371-372]. The note states that the "[v]isit details [were] reviewed and approved by supervising provider Priyanka Gait, M.D.," who electronically signed the progress note. [AR 372].

At best, the medication note cited by the ALJ establishes that as of February 2015, plaintiff

---

[7] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. . . . Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects.

Garrison v. Colvin, 759 F.3d 995, 1003 n.4 (9th Cir. 2014) (internal quotation marks and citations omitted).

demonstrated a mixed response to prescribed medications and was exhibiting significant psychiatric symptoms that were consistent with her subjective hearing testimony. Even if that note had demonstrated a good response to treatment, one instance of improvement in plaintiff's symptoms would have been insufficient to undermine plaintiff's subjective testimony of a history of such symptoms and resulting functional limitations. As the Ninth Circuit has

> emphasized while discussing mental health issues, [that] it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms. They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.

Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) (internal citations omitted). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must in fact constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." Garrison, 759 F.3d at 1018 (holding that the ALJ "erred in concluding that a few short-lived periods of temporary improvement in [the claimant's] mental health symptoms undermined [her] testimony").

The ALJ's other stated reason for discounting plaintiff's subjective testimony was that there was a "notable inconsistency" between plaintiff's testimony "that she cannot take care of [her] children" and her report to the Commissioner's consultative examining psychologist, Dr. Ross, "that she cares for her children." [AR 24 (citing AR 289)]. Dr. Ross reported that plaintiff said that her "outside activities" were "going to doctor's appointments and taking care of her children." [AR 289]. There is some inconsistency between those two statements, but since the consultative examiner did not explore whether plaintiff ever received or needed help with her children, that inconsistency is not "notable" nor is it a "clear and

convincing" reason for discrediting plaintiff. Neither plaintiff nor her sister testified that plaintiff was completely unable to care for her children or completely failed to do so. Instead, they testified that plaintiff often needed help caring for her kids, particularly when her symptoms flared up and she spent most of the day in bed. [See AR 40, 48-49, 57-60].

The final reason given by the ALJ for not fully crediting plaintiff's subjective testimony is her "poor earnings record and [that she] worked only sporadically prior to the alleged disability onset date, which suggests that the claimant's continuing unemployment is not due to medical impairments." [AR 24]. A claimant's prior work record and efforts to work may be considered in assessing credibility. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Marsh v. Colvin, 792 F.3d 1170, 1173 n.2 (9th Cir. 2015) (holding that the ALJ permissibly relied on the claimant's "limited work history," along with other factors, to discredit her subjective testimony).

Plaintiff was born on September 3, 1985 and alleged that her disability began on January 1, 2000, when she was not yet 15 years old. [AR 19, 162, 198]. Her youth at her alleged onset date means that her failure to work before her alleged onset date does not support the negative inference drawn by the ALJ. When plaintiff protectively filed her SSI benefits application on October 2, 2012, she was 27 years old, and she was 29 years old when the ALJ's decision was issued. [AR 25, 162]. Plaintiff had past relevant work caring for two children from January 2006 through December 2006, starting when she was 21 years old. [AR 25, 62, 156, 166-167]. In her application for benefits, she said that she stopped working at that job due to her impairments. [AR 166-167]. Given plaintiff's relative youth and her allegations of disability from an early age, plaintiff's very limited work history and earnings record are not clear and convincing reasons for discrediting, at least not without further analysis by the ALJ showing that he took those factors into account. See Schaal v. Apfel, 134 F.3d 496, 502-503 (2nd Cir. 1998) ("An ALJ should explore a claimant's poor work history to determine whether her absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether her absence is consistent with her claim of disability.").

The ALJ's reasons for rejecting the alleged severity of plaintiff's subjective allegations are not specific, clear, and convincing reasons based on substantial evidence in the record.

**NP Wilkerson's opinion**

Plaintiff contends that the ALJ erred in rejecting the opinion of NP Wilkerson.

On February 18, 2015, NP Wilkerson completed a mental RFC assessment form and a summary of clinical information. [AR 368-369, 384-387]. She gave plaintiff diagnoses of OCD; PTSD; and severe, recurrent major depression with psychosis. [AR 368]. She also checked boxes indicating that plaintiff had a broad array of mental functional limitations that would preclude performance of most of those functions for 15% or more of an eight-hour work day. The vocational expert testified that a person with such limitations would be unable to work. [AR 384-387; see AR 64-65]. NP Wilkerson also opined that plaintiff would be absent from work five days a month as a result of her impairments. [AR 386]. NP Wilkerson said that she "believe[d] within a reasonable degree of medical certainty" that plaintiff was unable to work in a competitive work setting for a continuous period of at least six months. [AR 387].

The ALJ rejected NP Wilkerson's opinion because it was "inconsistent with the treatment notes showing that [plaintiff] responded to medications," and because she is not an "acceptable medical source" as defined by the Commissioner, but rather an "other source." [AR 24 (citing 20 C.F.R. § 416.913)].

It is undisputed that, standing alone, a nurse practitioner such as NP Wilkerson is not an acceptable medical source, such as a licensed physician or psychologist, but rather is an "other source." [AR 30-31, 33]. See 20 C.F.R. §§ 404.1502, 404.1527, 404.1513, 416.902, 416.913, 416.927. The ALJ may reject information from "other sources" by "giv[ing] reasons germane to each witness for doing so." Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)). However, a provider who is not an acceptable medical source but who works closely under the supervision of a physician in treating a claimant may be considered acceptable medical source even though that provider would not be considered an acceptable medical source in treating the claimant independently. See Molina, 674 F.3d at 1111 (holding that a physician's assistant did not qualify as an acceptable medical source, and that because the record did not show that she worked under a physician's close supervision, the ALJ's "germane reasons" were sufficient to discount her opinions) (citing Gomez v. Chater, 74 F.3d 967, 970-971 (9th Cir. 1996) (explaining that opinions from "other sources" may be given less weight than those from "acceptable medical sources" under the governing regulations, and holding that the opinion of a nurse practitioner who worked so closely under the supervision of a physician that she acted as the physician's agent was not only properly considered, but was properly deemed part of an "acceptable

medical source"))[8]; see also Britton v. Colvin, 787 F.3d 1011, 1013 (9th Cir. 2015) (per curiam) (rejecting the contention that an NP's opinion should be accorded deference where "nothing in the record indicates that [the NP] worked so closely under [either of two physicians] as to be considered an agent of either," in that the record showed only that the NP received documents from and forwarded documents to a clinic where two physicians worked).

In Gomez, the Ninth Circuit held that an NP who worked with the claimant's treating physician was an acceptable medical source even though the treating physician did not personally examine the claimant for nearly two years before the NP rendered her opinion, but the NP "consulted with [the treating physician] regarding [the claimant's] treatment numerous times over the course of her relationship with [him]" and therefore "worked closely under the [treating physician's] supervision" and "was acting as [his] agent . . . in her relationship with [the claimant]." Gomez, 74 F.3d at 971. Given the evidence that a supervising psychiatrist reviewed and approved NP Wilkerson's treatment reports, the ALJ erred in failing to consider whether or not NP Wilkerson was an acceptable medical source whose opinion was entitled to deference and should have developed the record further in that regard if necessary.

Even if NP Wilkerson is not an acceptable medical source, moreover, the ALJ's conclusion that NP Wilkerson's opinion was inconsistent with her treatment notes because plaintiff "responded to medications"

---

[8] In Molina, the Ninth Circuit explained that "[i]n holding that a nurse practitioner could be an acceptable medical source, Gomez relied in part on language in 20 C.F.R. § 416.913(a)(6), which stated that '[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence.' That language has since been repealed." Molina, 674 F.3d at 1111 n.3. The Ninth Circuit has as yet declined to decide whether Gomez remains good law, but it appears to have assumed that an "other source" could still be considered an acceptable medical source if the record contained evidence of close supervision amounting to an agency relationship, irrespective of the repeal of the "interdisciplinary team" regulatory language. See Colburn v. Berryhill, 2017 WL 3188447, at *1 (9th Cir. July 27, 2017) ("[A]ssuming without deciding that [Gomez] remains good law following the repeal of 20 C.F.R. § 416.913(a)(6) in 2000, the administrative record does not establish that [an NP] worked closely enough with supervising psychiatrist . . . to trigger the interdisciplinary team exception in Gomez"); Britton v. Colvin, 787 F.3d 1011, 1013 (9th Cir. 2015) ("express[ing] no view on the validity of Gomez," but "even applying Gomez, [the NP] should not be considered a medically acceptable source here" because the record lacked evidence of close supervision amounting to an agency relationship); Molina, 674 F.3d at 1111 (expreslly declining to address whether Gomez remains good law but affirming the ALJ's decision not to consider the opinion of a physician's assistant as an acceptable medical source when "the record [did] not show that she worked under a physician's close supervision").

is not a germane reason for rejecting her opinion. As noted above in connection with the ALJ's evaluation of the subjective symptoms, the treatment reports cited by the ALJ do not permit a reasonable inference that plaintiff exhibited sustained improvement in response to medications. Therefore, the ALJ did not articulate germane reasons for rejecting NP Wilkerson's opinion.

**RFC finding and step 5 finding**

Plaintiff contends that the ALJ's mental RFC finding limiting plaintiff to simple, routine tasks and occasional contact with the public and co-workers does not adequately account for the "moderate" limitations in concentration, persistence, and pace found by the ALJ at step three of the sequential evaluation procedure. [See AR 22]. Plaintiff further contends that the testimony of a vocational expert ("VE") in response to a hypothetical question based on that RFC is not substantial evidence supporting the ALJ's step-five finding that plaintiff can perform alternative work. [See AR 22-23].

Plaintiff's contention regarding the ALJ's RFC finding fails. "The limitations identified in step 3 . . . are 'not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3.' The ALJ must consider the step–3 limitations along with 'all of the relevant evidence in the case record' when forming the RFC." Israel v. Astrue, 494 F. App'x 794, 796 (9th Cir. 2012) (quoting SSR 96–8p, 1996 WL 374184, at *4, *5). An ALJ's RFC finding "adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (citing Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (holding that where the state psychologist opined both that the claimant often had deficiencies of concentration, persistence or pace and that the claimant was "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function," the ALJ's hypothetical including ability to perform "simple, routine, repetitive tasks" adequately, captured the claimant's deficiencies in concentration persistence or pace); Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001) (holding that where the ALJ's hypothetical incorporated concrete restrictions identified by the examining psychiatrist regarding quotas, complexity, and stress, the ALJ did not err in failing to include deficiencies in concentration, persistence, or pace).

The ALJ permissibly relied on the medical testimony in translating "moderate" deficiencies in concentration, persistence, and pace into an RFC for simple, routine tasks involving no more than occasional

contact with the public and co-workers. At steps three and four, the ALJ relied on the opinions of the non-examining state agency medical consultants and the Commissioner's consultative examining psychologist. [AR 22-23]. The state agency medical consultant who reviewed plaintiff's file initially opined that plaintiff was "moderately limited" in several areas, including the ability to maintain concentration and attention for extended periods, but also opined that plaintiff retained the RFC for "simple basic work-tasks (i.e., up to three-step tasks) in a nonpublic setting." [AR 75]. On reconsideration, another state agency medical consultant opined that plaintiff's mental impairment was not severe [AR 85-86], and the consultative examining psychologist opined that plaintiff had no mental functional limitations. [AR 292-293]. The ALJ rejected the two less restrictive opinions and gave plaintiff "some benefit of the doubt" by adopting the more restrictive mental deficiencies and RFC identified by the initial state agency reviewer. [AR 24]. Under Ninth Circuit law, the ALJ was entitled to "translate" the mental functional deficiencies assessed at step three into concrete mental functional restrictions contained in the medical opinion evidence (provided, of course, that the ALJ properly weighed conflicting medical opinions). See Israel v. Astrue, 494 F. App'x 794, 796 (9th Cir. 2012) (rejecting the contention that the ALJ erred because he did not adequately include his own step–three finding that the claimant had "moderate difficulties" in "concentration, persistence, or pace" in his RFC finding and hypothetical questions, and holding that the ALJ permissibly adopted restrictions identified in the medical opinion evidence).

Plaintiff also contends that even if the RFC finding properly accounts for moderate deficiencies in concentration, persistence, and pace under Ninth Circuit law, the VE's testimony in this case is not substantial evidence supporting the ALJ's step-five finding.

At step five of the sequential evaluation procedure, the Commissioner has the burden of establishing, through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines, that the claimant can perform other jobs that exist in substantial numbers in the national economy. Bruton v. Massanari, 268 F.3d 824, 827 n.1 (9th Cir. 2001). The ALJ's job at the fifth step in the sequential evaluation procedure is to pose hypothetical questions that set out all of the claimant's impairments for the consideration of the vocational expert, who then "translates these factual scenarios into realistic job market probabilities . . . ." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999); see Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993). "Where the testimony of a VE is used at Step Five, the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities

and vocational qualifications would satisfy." Osenbrock v. Apfel, 240 F.3d 1157, 1162-1163 (9th Cir. 2001).

In response to a hypothetical question by the ALJ incorporating the mental functional restrictions in the RFC finding, the VE testified that the hypothetical person could perform the alternative jobs of hand packager and stores laborer, and the ALJ relied on that testimony to find plaintiff not disabled at step five. [See AR 26, 63]. On cross-examination, however, plaintiff's counsel asked the VE whether her testimony "integrated" or "implicated" any restrictions in concentration, attention, or pace. [AR 65-66]. The VE answered, "Nothing – no. . . . No." [AR 66]. Since the VE expressly disclaimed taking any such deficiencies into account, it was incumbent on the ALJ to elicit further testimony from the VE to ensure that the alternative jobs she identified can be performed by someone who has moderate deficiencies in concentration, attention, and pace. The ALJ erred in failing to do so.

**Remedy**

A district court may "revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing[.]" Treichler v. Comm'r of Soc., Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)). As the Ninth Circuit has explained, however,

> the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. Our case law precludes a district court from remanding a case for an award of benefits unless certain prerequisites are met. The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence. If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved. In conducting this review, the district court must consider whether there are inconsistencies between the claimant's testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled. Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits.

Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) (internal quotation marks, citations, and brackets omitted).

Those "rare circumstances" compelling a remand for an award of benefits are not present. For the reasons described above, the ALJ committed reversible legal error. However, after reviewing the record as a whole, the Court concludes that the record is neither fully developed nor free from conflicts and ambiguities, that all essential factual issues have not been resolved, and that serious doubt remains as to whether plaintiff is disabled. For example, there are specific, material inconsistencies between and within plaintiff's subjective statements in disability reports, in her testimony, and in reports to her treating and examining sources that the ALJ overlooked that could provide a legally sufficient basis for discounting her subjective testimony. Additionally, the record is ambiguous and needs further development as to whether or not NP Wilkerson is an acceptable medical source. If she is properly considered no more than an "other source," there appear to be germane reasons the ALJ could articulate for rejecting her opinion under the relevant regulations. Further development of the record also is needed with respect to the VE's testimony regarding alternative jobs that plaintiff can perform with the RFC found by the ALJ. Therefore, a remand for further administrative proceedings would serve a useful purpose and is the appropriate remedy.[9]

On remand, the Commissioner shall direct the ALJ to conduct a supplemental hearing, fully and fairly develop the record, reevaluate the record as a whole, and issue a new decision containing appropriate findings at all steps of the sequential evaluation procedure.

## Conclusion

For the reasons stated above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner for further administrative proceedings consistent with this memorandum of decision.

**IT IS SO ORDERED.**

August 29, 2017

_____
ANDREW J. WISTRICH
United States Magistrate Judge

---

[9] In light of this disposition, it is unnecessary to address plaintiff's remaining contentions.